UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **United States of America,** | Crim. No. 08-139 (JMR/SRN) |
| **Plaintiff,** | |
| v. | **REPORT AND RECOMMENDATION** |
| **Uriel Fernando Arguello,** | |
| **Defendant.** | |

Ann Anaya, Esq., United States Attorney's Office, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, for Plaintiff United States of America

Charles L. Hawkins, Esq., 150 South Fifth Street, Suite 3260, Minneapolis, Minnesota 55402, for Defendant Uriel Fernando Arguello

SUSAN RICHARD NELSON, United States Magistrate Judge

The above-captioned case comes before the undersigned United States Magistrate Judge on Defendant Uriel Fernando Arguello's Motion to Suppress Statements (Doc. No. 13) and Motion to Suppress Evidence (Doc. No. 14).[1]  This case has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.

**I.     BACKGROUND**

An indictment was filed against Defendant Uriel Fernando Arguello on May 7, 2008, charging him with one count of possession of a firearm by a felon and one count of possession with intent to distribute a controlled substance.  This Court held a pretrial motion hearing on July 14, 2008, at which Brooklyn Park Police Detective Rielly Nordan and Brooklyn Center Police

---

[1] The Court will address Defendant's non-dispositive motions in a separate Order.

Officer John Ratajczyk testified.  The Court also received a videotaped interview of Defendant into evidence.

At the conclusion of the hearing, Defendant asked for a copy of the evidence log showing that the audio and video recordings of his traffic stop, arrest, and statements were preserved. Defendant also asked for seven days following his receipt of the evidence log in which to brief any issues arising from the destruction of those recordings.  Because this delay would impact the trial date, Defendant orally waived his right to a speedy trial, and the Court ordered him to also file a written waiver.  The Court then granted Defendant's requests and ordered the Government to produce the evidence log by July 18, 2008.  After receiving a brief extension, the Government filed a letter on July 22, 2008, indicating that the recordings were never logged as evidence.  On July 30, 2008, Defendant notified the Court that he did not intend to file a post-hearing memorandum, and the Court took the motions under advisement at that time.

## II.  FACTS

The following facts were elicited from the testimony and exhibit introduced at the motion hearing.

In August 2007, a confidential informant (CI) told Detective Nordan that he knew a Hispanic male in his mid- to late-twenties who was selling methamphetamine.  The CI said that the man's first name was "Uriel" and that his nickname was "Nica."  The CI also told Detective Nordan that Nica lived in Maple Grove, Minnesota, near 72nd Avenue North and Deerwood Lane.  Detective Nordan searched the Department of Motor Vehicles (DMV) database for licensed drivers with the first name "Uriel" and learned that Uriel Arguello lived at 11607 72nd Avenue in Maple Grove.  Detective Nordan drove to that address, which was located in a cul-de-

sac. As he circled through the cul-de-sac, he saw a man who resembled Uriel Arguello's driver's license photograph, washing a dark-colored SUV in the driveway. At the hearing, Detective Nordan identified Defendant as the person he saw that day.

On August 24, 2007, the CI telephoned Detective Nordan and said he had seen Defendant with a black and silver semi-automatic handgun and a large amount of methamphetamine. He said that Defendant was in a dark-colored SUV with the license plate number RRU 652. The CI was very concerned about the handgun, and because Detective Nordan was not in the area at the time, he told the CI to call 911. In addition to the information he had given Detective Nordan, the CI told the 911 dispatcher that Defendant was at a gas station at the corner of Brooklyn Boulevard and 69th Avenue in Brooklyn Center. The dispatcher contacted the Brooklyn Center Police Department to respond to the call. Detective Garrett Flesland listened to the 911 call, spoke to the CI, and drove to the scene. Defendant's vehicle was still at the gas station when Detective Flesland arrived, and the detective verified the information provided by the CI. Detective Flesland also called Detective Nordan, who shared the information he had previously received from the CI.

Brooklyn Center Police Officer Ratajczyk was on patrol that day. He heard the radio dispatch and responded to the call. As he drove to the scene, he spoke with Detective Flesland, who said that the suspect vehicle's license plate number was RRU 652 and that the vehicle was still in the parking lot of the gas station. Detective Flesland also said there was a loaded gun and methamphetamine in the car. Officer Ratajczyk checked the vehicle registration from the license plate number and learned that the registered owner was a Hispanic male, approximately thirty years of age. Officer Ratajczyk also learned that the registered owner's driver's license had been

revoked. Based on all of the information Officer Ratajczyk had learned from the 911 call, Detective Flesland, and his investigation, Officer Ratajczyk concluded that the person driving the dark-colored SUV was the registered owner.

Defendant left the gas station before Officer Ratajczyk arrived but had driven only a few blocks when Officer Ratajczyk spotted him driving eastbound on Brooklyn Boulevard. Officer Ratajczyk followed Defendant onto the freeway and saw him make two abrupt lane changes without signaling. Defendant then made several left-hand turns before arriving at a residence on Ewing Avenue and parking the car in the driveway. By this time, Officer Ratajczyk had several independent bases to initiate a traffic stop: Defendant's failure to use his turn signals when changing lanes, driving after revocation, and the information from Detective Flesland and the 911 call.

Officer Ratajczyk activated his lights and turned on his dashboard-mounted video camera, but he did not approach the vehicle out of concern that a loaded weapon was inside. Officer Ratajczyk radioed for backup and waited. He saw Defendant look at him and then exit the vehicle. Officer Ratajczyk told Defendant to get back in the car and stay there until told otherwise. Defendant asked why he was being stopped. Officer Ratajczyk drew his weapon and again instructed Defendant to get back in his car, which he did. Officer Trout arrived at the scene a few seconds later. Officer Ratajczyk ordered Defendant to exit the vehicle with his hands up, walk backwards, and kneel. The officers pat-searched Defendant, and he spontaneously said that there was a loaded gun in the pocket behind the passenger seat but that it was not his gun. Officer Ratajczyk searched the vehicle and found a handgun in the location Defendant had described. Another officer at the scene called for a canine drug sniff of the car,

and the canine alerted to the presence of narcotics. Officers then searched the vehicle and recovered a plastic bag of methamphetamine.

Meanwhile, Officer Ratajczyk transported Defendant to the police department. En route, Defendant made several voluntary statements, which were captured on the squad car's audio recording device. Officer Ratajczyk did not ask any questions, even after Defendant began talking, although he did tell Defendant that if he wanted to continue talking, he would listen. At the station, Officer Ratajczyk testified that he asked his supervisor to remove the tapes from his recording equipment and put them into evidence. He did not personally remove the tapes because only the supervisor has a key to the equipment.

The day after the arrest, Detective Nordan interviewed Defendant at the Brooklyn Park Police Department. Detective Nordan was not armed or in uniform. Before he asked any questions, he advised Defendant of his <u>Miranda</u> rights. Defendant did not ask any questions and agreed to talk. Throughout the interview, Defendant appeared to understand Detective Nordan, and he spoke willingly and coherently. He did not appear tired or confused. Defendant never asked to stop the interview or to consult a lawyer. Detective Nordan did not make any threats or promises.

Officer Ratajczyk later wrote in his police report that Defendant's arrest and statements had been recorded on his audio and video recording equipment. Detective Nordan learned about the recordings when he read the report. On August 27, 2007, Assistant United States Attorney Andrew Winter told Detective Nordan that Defendant would be prosecuted in federal court, and he instructed the detective to gather and preserve all of the evidence. Detective Nordan did not specifically ask Officer Ratajczyk for the recordings. As Detective Nordan explained at the

5

hearing, Defendant had indicated his intention to cooperate with law enforcement, and Detective Nordan therefore focused on the cooperation aspect of the investigation instead of the potential prosecution. Officer Ratajczyk testified at the suppression hearing that no one asked him for any tapes until July 1, 2008. At that time, he attempted to locate the tapes but could not.

According to Brooklyn Center Police Department policy, the on-duty sergeant is responsible for removing tapes from squad cars and storing them in a property room. If a tape may be needed as evidence, the investigating officer must ask the sergeant to remove the tape from the property room and inventory it as evidence, in which case the tape is retained. If the tape is not inventoried as evidence, it is erased and re-used after ninety days. In July 2008, Brooklyn Center Police Department evidence technician Patty Brunell looked for tapes associated with this case, at the request of Mr. Winter. She concluded that the tapes had never been inventoried as evidence and were erased and recycled after ninety days.

## III.  DISCUSSION

Defendant argues that the traffic stop was unlawful because the information from the informant was not reliable. Defendant also challenges the statements he made to law enforcement officers on August 24 and August 25, 2007.

### A.  The Traffic Stop

Defendant argues that the traffic stop was unlawful because the information from the CI was not reliable. However, Defendant fails to consider the two other bases for the traffic stop, driving after revocation and changing lanes without signaling, either of which would have independently justified the stop. When an officer sees a violation of a traffic law, even a minor one, he has probable cause to stop the vehicle. United States v. Brown, 345 F.3d 574, 578 (8th

Cir. 2003); see Whren v. United States, 517 U.S. 806, 810 (1996).

In addition, the Court finds that the CI had provided reliable information. To establish reasonable suspicion or probable cause for a traffic stop, information from an informant must be reliable. See United States v. Brown, 49 F.3d 1346, 1349 (8th Cir. 1995). If an informant does not have a history of providing reliable information, his reliability may nonetheless be established through independent verification or corroboration by police officers. Id. (citations omitted). Even "the corroboration of minor, innocent details can suffice to establish probable cause." United States v. Reiner Ramos, 818 F.2d 1392, 1397 n.7 (8th Cir. 1987).

In this case, police officers verified several details provided by the CI. From Detective Nordan's independent observation and DMV search, he verified that a Hispanic man in his twenties named Uriel lived in Maple Grove near 72nd Avenue North and Deerwood Lane. Detective Nordan also verified that Uriel drove a dark-colored SUV. The CI later gave the license plate number of the SUV as RRU 652, which corresponded with the information Detective Nordan had obtained from the DMV. The CI's statement that Defendant was at a gas station at the corner of Brooklyn Boulevard and 69th Avenue in Brooklyn Center on August 24, 2007, was verified by Detective Flesland, who also saw Defendant there. The Court concludes that the corroborated information was sufficient to establish the reliability of other information provided by the CI.

### B.    The Statements on August 24, 2007

Defendant moves to suppress the statement he made during the pat-search and the statements he made in Officer Ratajczyk's squad car. Ordinarily, a law enforcement officer must advise a person of his Miranda rights before interrogating that person in a custodial setting.

Illinois v. Perkins, 496 U.S. 292, 297 (1992).  However, Miranda "does not preclude admission of statements that a defendant in custody volunteers and that are not the product of any interrogation by the police."  United States v. Waloke, 962 F.2d 824, 829 (8th Cir. 1992) (citing Rhode Island v. Innis, 446 U.S. 291, 299-301 (1980)).  Defendant's statements were not the product of interrogation.  The only evidence before the Court is that Defendant's statements were spontaneous and voluntary.  Accordingly, the motion to suppress statements made on August 24, 2007, should be denied.

### C.   The Statement on August 25, 2007

The day after Defendant was arrested, Detective Nordan interviewed him at the Brooklyn Park Police Department.  Before asking any questions, he advised Defendant of his Miranda rights.  Defendant waived those rights and spoke with the detective.  As long as Defendant's waiver was "made voluntarily, knowingly, and intelligently," his statement is admissible in court.  See Miranda v. Arizona, 384 U.S. 436, 444 (1966).  All of the evidence before the Court indicates that Defendant's waiver was voluntary, knowing, and intelligent.  Detective Nordan was not armed or in uniform during the interview, and he made no threats or promises.  Defendant appeared to understand the questions and answered coherently.  He did not appear tired or confused.  He never asked to stop the interview or to consult a lawyer.  Accordingly, Defendant's statement made on August 25, 2007 should not be suppressed.

### D.   The Effect of the Deleted Recordings

At the hearing, Defendant suggested that the Brooklyn Center Police Department might have wrongfully deleted the tapes of his arrest and statements, although he declined to file a post-hearing memorandum on the issue.  "[U]nless a criminal defendant can show bad faith on

the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Arizona v. Youngblood, 488 U.S. 51, 58 (1988).  Here, the audio and video recordings were potentially useful, but Defendant has not shown that the police acted in bad faith when they deleted the recordings.  See Morales v. Ault, 476 F.3d 545, 555-56 (8th Cir. 2007) (finding that destruction of evidence "was certainly negligent" but not done in bad faith).  Moreover, even if Defendant had shown that the officers acted in bad faith, his remedy is not the suppression of evidence at trial.  See id. (addressing the due process issue under Brady on habeas review).

## IV.   RECOMMENDATION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant Uriel Fernando Arguello's Motion to Suppress Statements (Doc. No. 13) be **DENIED**; and

2. Defendant Uriel Fernando Arguello's Motion to Suppress Evidence Obtained Through Search (Doc. No. 14) be **DENIED**.


Dated: July 30, 2008

   s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge


Pursuant to D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 14, 2008**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo

determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.